Argued March 6; affirmed March 26, 1935

# LINDEKUGEL *v.* SPOKANE, P. & S. RY. CO.

(42 P. (2d) 907)

*Fletcher Rockwood,* of Portland (Charles A. Hart and Carey, Hart, Spencer & McCulloch, all of Portland, on the brief), for appellant.

*Hy Samuels* and *C. J. Stocklen,* both of Portland (C. W. Robison and Davis & Harris, all of Portland, on the brief), for respondent.

KELLY, J. At about 3 o'clock a. m. of June 20, 1931, a train consisting of an engine, a tender and a caboose operated by defendant collided with plaintiff's automobile at a place between Portland and Linnton where Ferry street crosses defendant's railroad track. As a result plaintiff sustained personal injuries.

At the close of the testimony, defendant moved for a directed verdict in its favor upon the ground, among others, that the evidence established as a matter of law that plaintiff's alleged negligence caused or contributed to cause the accident. The refusal of the trial court to grant this motion is the first error assigned by defendant.

At the time of the collision, defendant's engine, tender and caboose were proceeding northerly from Portland toward Linnton and plaintiff's automobile was traveling easterly on Ferry street. To the east of the track and north of Ferry street (that is, across the track and to plaintiff's left as she approached the crossing) there was a post upon which a wigwag signal had been in operation, but which had recently been disconnected. Plaintiff introduced testimony to the effect that the operation of this automatic signaling device had been disconnected only the day before the accident. Defendant's witness testified that it had been disconnected four or five days before the accident. For about 10 days before the accident, plaintiff had lived about 45 feet easterly from the crossing and was aware of the operation of the wigwag signal there.

Defendant's signal supervisor, who testified that he disconnected the wigwag signal at this crossing on June 15, 1931, explained that the signal consisted of a banner about 22 inches in diameter suspended about 30 inches below a gong; and that it was operated by an electric circuit from a battery, that "the wigwag

tripped the tripper that made the gong sound on the approach of a train''.

As to plaintiff's familiarity with this wigwag signal, we quote from her testimony:

''Q. Now, when you first came there, tell the jury what kind of a signal, if any, the railway company maintained at that crossing.

A. Had a wigwag signal there.

Q. A wigwag signal. And what else on the signal?

A. A bell.

Q. Would that wigwag signal and the bell sound whenever any train came across?

A. Yes, sir.

Q. Have you heard that wigwag signal during the daytime and the nighttime as well?

A. Yes, sir.

Q. How far distant, if you know, from the crossing proper would a train have to be before you heard this wigwag signal?

A. Oh, I should judge about 450 feet—or yards, or so.

Q. About 450 yards?

Mr. Rockwood: Just a minute. Did you say 450 feet or yards?

A. Well, about under the bridge.

\*     \*     \*     \*     \*

Q. Now, that automatic signal that was there, had that been there at the time you came there?

A. Yes, sir.

Q. And the wigwag, as you term the arm, had been there?

A. Yes, sir.

Q. And how many times would you say in that week and a half or ten days or two weeks you were there that you had seen or heard that?

A. Oh, several times.

\*     \*     \*     \*     \*

Q. I will ask you whether or not you were familiar with that wigwag signal and the bell?

A. Yes, sir.''

Before attempting to cross the track, according to plaintiff's testimony, she stopped her automobile three times and looked and listened to ascertain whether it would be safe to proceed.

We quote from her testimony:

"Q. And as you went down the hill, just trace for the jury the conduct of the car; what did you do?

A. When I went down the hill I came in low, and at the top of the hill I came to a stop. Then I came down in low, came down about 50 or 75 feet and came to a complete stop.

Q. Then what did you do?

A. I listened and as there was no bell ringing or no lights, no whistle of any kind, I proceeded on.

Q. Then what did you do?

A. I came down about ten feet or so from the railroad crossing sign, I stopped again complete. I listened and I looked both ways. There was no bell ringing, I heard no whistle of any kind, the road was clear for me to go across.

Q. Now, at that time or at any time from the time you came to a stop at the top of Ferry Street at that time, did you hear whistle, bell or gong of any kind?

A. I absolutely, Mr. Robison, heard nothing.

Q. Did you see any light or headlight on an engine?

A. No, sir."

As to the visibility at the time of the collision, the testimony of plaintiff is not directly challenged. The conductor on defendant's train was at his desk, the head brakeman was looking at the new St. Johns bridge, which unquestionably is well worth looking at even at 3 o'clock in the morning, the engineer was unable to see plaintiff's car, because he was on the wrong side of the engine cab, which by the way was the right side, and the fireman from the left side of the cab saw merely reflections of light somewhere back on the hill.

We quote from the fireman's testimony:

"Q. Now, before this accident happened, before the collision actually took place, did you see the automobile which was later involved in the collision?

A. No, I didn't see the automobile. I seen reflections of light somewhere back on the hill.

Q. Are you able to estimate how far back from the track the automobile was when you saw those lights?

A. Well, I would say some fifty feet.

Q. Was the automobile at that moment standing still or running?

A. Well, I couldn't say. It was running; it wasn't going very fast.

Q. Were you able to observe that automobile from that moment up until the time of collision?

A. No, I lost sight of it then.

Q. Did you see it again then before the actual collision?

A. Just a few feet from the track.

Q. Was it standing still or moving at that time?

A. Well, I think it was moving. I couldn't say, but it must have been."

This witness testified that the engine light was burning brightly; that he could distinguish objects very easily; that the fog did not materially impede his vision, and that he could see a long ways ahead.

The engineer testified that there was just a little bank of fog there that morning but nothing to amount to anything.

Plaintiff testified that upon her first stop, which was at the top of the hill, she could not see any distance to the north or south of the track. Obviously, this was because a store building intervened to the north and trees and shrubs to the south. Plaintiff also testified that upon her second stop she could see toward Portland only about 50 or 75 feet.

When first interrogated thereupon, plaintiff testified that upon her third stop she could see toward

Linnton a distance of four or five hundred yards or so; and toward Portland about a couple of hundred yards.

Later, after defendant's testimony had been received and defendant had rested, plaintiff was recalled and she then testified that at her last stop when looking up the track toward Portland she could see about three automobile lengths.

The question involved is whether as a matter of law plaintiff must be held to have been contributorily negligent or whether there are circumstances in this record making this case an exception to the cases where, in attempting to cross a railroad track, the traveler is deemed negligent because of failure to look or listen or to see and hear the approaching train.

The collision occurred at night and at a crossing where, until very shortly before it happened, a wigwag signal had been in operation, but which, at the time of the accident, was disconnected.

We are aware that the authorities are in conflict with respect to the effect of the nonoperation of a wigwag signal which formerly was in use, upon the question presented by defendant's motion.

The authorities are collated in an annotation at page 975, et seq., of Volume 53 A. L. R. Par. III. We quote the headnote thereto:

"However, recovery against a railroad company for negligence for the failure of a signaling device to operate at a railroad crossing and warn the approach of a train may be defeated by proof of contributory negligence on the part of the traveler in putting too much reliance on the signal, and not employing that degree of care for his own safety which the law demands.

"The decisions are not in accord as to the extent to which a traveler may rely on the indication of safety which the silence of a signaling device at a crossing implies. In one line of cases, it is held that a traveler

has no right to rely solely on the silence of the signal, and is as a matter of law guilty of contributory negligence in proceeding to cross the track without taking further precautions for his own safety."

Following this headnote is a citation of numerous authorities, some of which are briefly reviewed.

Then, the editor makes the following statement:

"In perhaps a longer line of decisions it is held that, while the failure of a signaling device at a railroad crossing to operate and warn of the approach of a train does not entirely relieve a traveler from his duty to look and listen for an approaching train, nevertheless the traveler may rely to some extent on the apparent safety implied from the silence of the signal, and such silence of the signal is a circumstance to be taken into consideration by the jury on the issue of contributory negligence."

Following that statement many other authorities are cited.

At page 788 of 1916D, L. R. A., there is an annotation from which we also quote:

"It is difficult to deduce from the cases any definite rule as to the extent to which a traveler on a highway may rely upon automatic safety devices placed at railroad crossings for his protection. The cases seem to agree that the presence of such devices at a crossing may properly be regarded as having some effect upon the care required of a highway traveler, but some of the cases, while apparently recognizing this principle, require such additional precautions upon the part of the traveler, when considering a concrete example, that there seems to be no practical difference between the care required when an automatic device is present and that required when no such device is maintained."

The question has also been considered in the following cases wherein the court deemed the failure of the signal device to operate of sufficient effect to submit the issue of plaintiff's alleged contributory negligence

to the jury: *Baltimore & O. Ry. Co. v. Hawke,* 34 Del. 25 (143 Atl. 27); *Chicago & E. I. Ry. Co. v. Latta,* 91 Ind. App. 102 (166 N. E. 297); *Teague v. St. Louis S. W. Ry. Co.,* 36 Fed. (2d) 217; *Wabash Ry. Co. v. Walczak,* 49 Fed. (2d) 763; *Webster v. Canadian Pac. Ry. Co.,* 103 Vt. 460 (156 Atl. 524); *Lake Erie and Western Railroad Co. v. McFarren,* 188 Ind. 113 (122 N. E. 330); *Missouri Pac. R. Co. v. Brown,* 186 Ark. 339 (53 S. W. (2d) 587); *Perkins v. Kansas City Southern Ry. Co.,* 329 Mo. 1190 (49 S. W. (2d) 103); *Pennsylvania R. Co. v. Boyd,* 98 Ind. App. 439 (185 N. E. 160); *Southern Ry. Co. v. Whetzel,* 159 Va. 796 (167 S. E. 427); *Sisk v. Chicago B. & Q. R. Co.,* 67 S. W. (2d) 830.

In the following cases, which are not cited in 53 A. L. R., supra, the contrary is held: *Southern Ry. et al. v. Davis,* 152 Va. 548 (147 S. E. 228); *Stevenson v. Houston & T. C. R. Co.,* 19 S. W. (2d) 207; *Dardenne v. Texas & P. Ry. Co.,* 13 La. App. 262 (127 So. 459); *Norfolk & W. Ry. Co. v. Wellons' Adm'r.,* 155 Va. 218 (154 S. E. 575).

We have examined with interest the photographs taken in broad daylight on the day of the collision and we have carefully read and considered the testimony of defendant's witnesses as to the distance which they saw objects in the daytime from the crossing in the direction of Portland at a time some months subsequent to the accident in suit; but we cannot overlook the well-known fact that at night a very different view presents itself.

We recall Thomson's lines:

> "Now black and deep the night begins to fall,
> A shade immense! Sunk in the quenching gloom,
> Magnificent and vast, are heaven and earth.
> Order confounded lies; all beauty void,
> Distinction lost, and gay variety
> One universal blot."

■ It appears also that there was some fog which the trainmen noticed but the effect of which their testimony minimizes. The general test of negligence is that which an ordinarily careful person would or would not do.

■ Giving consideration to these circumstances and to the further fact that twelve jurors, who must be deemed to be at least ordinarily prudent, have given consideration to the whole record and have found that plaintiff was not contributorily negligent, we hold that this case is an exceptional one, and that the learned trial judge committed no error in overruling defendant's motion for a directed verdict.

In a case reflecting characteristically careful consideration, Mr. Justice HENRY J. BEAN quotes approvingly a rule laid down by the late Mr. Justice BURNETT (*Olds v. Hines,* 95 Or. 580 (187 P. 586, 188 P. 176)):

"We remember also that it is a binding principle that the plaintiff is entitled to the benefit of whatever his testimony tends to prove, although his witnesses may contradict each other, and that if any reasonable construction of the evidence on his behalf, or any part thereof, shall fairly tend to show that he is entitled to recover, it is the duty of the court to submit the question to the jury. On the other hand, if there can be no reasonable conclusion other than that the plaintiff himself was remiss in his duty at the time of the accident, it is incumbent upon the court so to declare, and order a nonsuit."

There the question presented itself as to whether the ringing of a bell at a street intersection and the sight of a train in that direction near the depot was such an influence as would divert the attention of an ordinarily prudent person in the light of the circumstances as they then appeared to him and excuse him from looking in the opposite direction during the passage of the automobile over the last 55 feet before reaching the track.

■ The case was tried before Mr. Justice BELT, while he was upon the circuit bench, and it was held in the opinion mentioned that the motion for a directed verdict in favor of defendants was properly overruled: *Kirby v. Southern Pacific Co.,* 108 Or. 290 (216 P. 735). We refer to this case as an illustration of the attitude of this court in support of the principle that the operation, and, hence, of course, the nonoperation, of a safety signal at a railroad crossing is a circumstance which should be given substantial effect in determining whether the conduct of a traveler at such crossing should be submitted to a jury or judged exclusively by the court upon the question of his alleged contributory negligence.

The Maryland court of appeals, in deciding a case involving the failure to observe the railroad company's usual custom of posting a flagman at the crossing when a train was about to pass, said:

"This case is an appropriate one for the application of the principle that, while a traveller on a highway is not relieved of the duty of exercising care at a railroad crossing because the danger signals usually employed there, to his knowledge, are not at the time displayed, yet the implied assurance of safety from the absence of the customary warning is a circumstance materially affecting the question whether the proper degree of care was exercised. This was a decisive consideration in favor of the submission of such an issue to the jury in *Balto. & O. R. Co. v. Stumpf, supra,* and *Balto. & O. R. Co. v. Windsor,* 146 Md. 429. In the first of those cases, a quotation by the court from the opinion in *Wilson v. N. Y. & N. H. R. Co.,* 18 R. I. 491, included the statement 'that open gates, or the absence of the usual signals of an approaching train or engine are implied assurance that no train or engine is approaching the crossing with intent to cross the street, upon which travellers on the street have a right to rely, and that if a traveller on the street be injured while crossing the

railroad in such circumstances, the question whether he was guilty of contributory negligence is for the jury.'" *State v. Balto. & O. R. Co.*, 157 Md. 256, 263 (145 Atl. 611).

We recognize the distinction between the warning given by a flagman and that of an automatic, mechanical device, and do not wish to be understood as holding that, as a matter of law, the silence of the signal's gong relieved plaintiff of the duty of looking and listening for approaching trains. We think that whether plaintiff placed too much reliance on the wigwag gong is a question for the jury. In this connection, it is to be remarked that plaintiff herself did not state how much reliance she gave it. If she had stated that she relied upon it to a greater extent than upon her vigilance in looking and listening for trains, it could have been argued with much plausibility that as a matter of law she was guilty of negligence in so doing.

■ The second assignment of error is based upon the refusal of the court to give the following instruction:

"I instruct you that if you find from the evidence of the witnesses that a headlight on the locomotive was lighted as the locomotive proceeded along the track from a point under the St Johns bridge up to the crossing, you shall then conclude that the plaintiff was guilty of contributory negligence as a matter of law and your verdict shall be for the defendant."

This requested instruction is defective in that it omits all reference to the element of contributiveness. It would not be sufficient merely to show that the headlight was lighted in order to prove contributory negligence on plaintiff's part. It would be necessary further to show that an ordinarily careful person situated as plaintiff was at the time would have seen it in time, if acting with ordinary care, to have avoided the collision. This omitted phase of the law of contributory negli-

gence bears upon the speed of the locomotive as well as the visibility at the hour of night in the fog then prevailing, and the effect of a disconnected, silent wigwag gong upon the mental reactions of an ordinarily careful person in plaintiff's situation.

The instruction given by the learned and experienced trial judge on this subject was even more favorable to the defendant than the foregoing observations would warrant. No error prejudicial to defendant was committed by refusing defendant's said request.

The propriety of a requested instruction on contributory negligence was not involved in *Olds v. Hines,* 95 Or. 580 (187 P. 586, 188 P. 716) ; or *Morser v. Southern Pacific Co.,* 110 Or. 9 (222 P. 736), 124 Or. 384 (262 P. 252), cited by defendant. It is true that in these cases this court held as a matter of law that the plaintiffs were contributorily negligent; but that is different from instructing a jury upon the law of contributory negligence.

■■ The third assignment of error is based upon the refusal of the trial court to withdraw the charge of excessive speed from the consideration of the jury. Plaintiff's failure to see the train from the last two places when she stopped as well as the distance the engine tender and caboose ran after the brakes were applied and the engine thrown into reverse are circumstances from which the jury could have drawn an inference of a higher rate of speed than that estimated by the trainmen. An apparently disinterested witness testified that the distance from the crossing to the place where the automobile was the next morning was 275 feet. The fireman testified that after the train had stopped, the train crew shoved the car down toward Linnton in order to get it off the track. The trainmen also testified that after the collision the train stopped within six rail lengths or approximately 175 feet.

The record is devoid of any estimate by experienced trainmen as to the distance within which such a train should make an emergency stop. No error was committed in refusing to withdraw the issue of alleged excessive speed from the jury, nor in refusing to instruct the jury that, if the speed of the train was less than 40 miles an hour, no recovery could be had on the charge relating to the speed of the train.

This specification of negligence is made in the following language:

"(a) That defendant was negligent and careless in running its locomotive at a high and dangerous rate of speed, to-wit: forty miles per hour."

■ When any fact alleged in a pleading is preceded by the words, "To-wit" or "that is to say", such fact is said to be "laid under a videlicet"; *Luka v. Behn,* 225 Ill. App. 105. The object of a videlicet is to dispense with strict proof: *Town of Manteno v. Surprenant,* 210 Ill. App. 438.

"The office of a videlicet is to mark that the party does not undertake to prove the precise circumstances alleged; and in such cases, he is not required to prove them." Vol. 3, Bouvier's Law Dictionary (Rawle's 3rd Rev.) p. 3400, and authorities there cited. Stephen-Andrews, Pleading in Civil Actions, p. 332.

■ An allegation of a specific number of miles per hour does not limit plaintiff to proof of that rate, but he may show the actual speed: *Debes v. Greenstone,* 260 S. W. 211. Plaintiff may prove a lesser rate as negligence: *Nashville C. & St. L. Ry. v. Prince,* 212 Ala. 499 (103 So. 463); *Waller v. Graff,* 251 S. W. 733; *Twigg v. Meyer,* 285 S. W. 120; *Bradley v. Becker,* 296 Mo. 548 (246 S. W. 561).

■ As stated, the conductor was not maintaining any lookout for cars approaching said crossing but was at

his desk. The brakeman was enjoying bridge (St. Johns). The engineer was on the wrong (right) side of the engine cab and could not see the traffic approaching the crossing, and the fireman merely saw some reflections of light. Notwithstanding these facts, which defendant's witnesses related, defendant assigns error in the refusal of the trial court to withdraw from the consideration of the jury the allegation of defendant's negligence in failing to keep a proper lookout or any lookout for cars approaching said crossing, and, particularly, the automobile in which plaintiff was riding. We cannot agree with defendant in this respect.

■ Plaintiff did not expressly state in her testimony that she relied upon the automatic warning signal and for that reason defendant assigns error in the giving of an instruction as follows:

"However, if you find that the plaintiff relied on the automatic warning signal, and that she did not know that it had been disconnected, you are instructed that you may consider that fact, together with other circumstances and conditions, on the issue of whether or not the plaintiff was guilty of contributory negligence."

We think that it is a reasonable deduction that plaintiff relied to some extent upon the wigwag signal in question from the repeated statements of plaintiff, that she heard no bell, and that no bell was ringing in connection with the admitted fact that when in operation the wigwag signal caused a gong or bell to ring, and in the light of the further fact that plaintiff was familiar with that particular signal and had not been advised that it had been disconnected.

Finding no reversible error, the judgment of the circuit court is affirmed.

CAMPBELL, C. J., and BELT and ROSSMAN, JJ., concur.